

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00244-CR

Christopher **KINES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Wilson County, Texas
Trial Court No. 16-07-153-CRW
Honorable Lynn Ellison, Judge Presiding

Opinion by:      Rebeca C. Martinez, Justice

Sitting:          Sandee Bryan Marion, Chief Justice
                  Rebeca C. Martinez, Justice
                  Irene Rios, Justice

Delivered and Filed: April 15, 2020

AFFIRMED

A jury convicted Christopher Kines of the murder of Jessica Edens and of tampering with evidence. The trial court assessed punishment at fifty years' confinement for murder and twenty years' confinement for tampering with evidence. Thereafter, Kines filed a motion for new trial, which the trial court denied after a hearing. In a single issue on appeal, Kines argues the trial court erred in denying his motion for new trial because he received ineffective assistance of counsel. We affirm the trial court's judgment.

**STANDARD OF REVIEW & APPLICABLE LAW**

**A.    MOTION FOR NEW TRIAL**

A trial court's ruling denying a defendant's motion for new trial is reviewed for an abuse of discretion. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). "We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable." *Id.* "A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006).

**B.    INEFFECTIVE ASSISTANCE OF COUNSEL**

Under the Sixth Amendment, a defendant in a criminal case is guaranteed the right to assistance of counsel. U.S. CONST. amend. VI. The right to assistance of counsel includes the right to "reasonably effective assistance of counsel." *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986). When considering a claim of ineffective assistance of counsel, we use the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant must prove by a preponderance of the evidence that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *See id.* at 687; *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Failure to show either deficient performance or prejudice defeats an ineffective assistance of counsel claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In considering whether counsel's performance was deficient, the defendant must prove that counsel's representation fell below an objective standard of reasonableness, which is measured by prevailing professional norms. *Strickland*, 466 U.S. at 687–88. Our review of counsel's performance is highly deferential and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, we will "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. We must "then determine whether, in light of all the circumstances, the [challenged conduct] . . . [was] outside the range of professionally competent assistance." *Id.* When making that determination, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michael v. Louisiana*, 350 U.S. 91 (1955)).

Assuming counsel's performance was deficient, the defendant must prove the deficient performance prejudiced his defense. *Id.* at 687. To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## ANALYSIS

Kines contends that he received ineffective assistance of counsel because his trial counsel failed to conduct a meaningful investigation of Kines's case, particularly by failing to interview and present any corroborating or impeachment witnesses and by failing to adequately communicate with him.

## A. FAILURE TO INTERVIEW AND PRESENT WITNESSES

Trial counsel has a duty to make an independent investigation of the facts of the case, which includes seeking out and interviewing potential witnesses. *Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App.—San Antonio 1999, pet. ref'd). However, the duty to investigate is not absolute. *Id.* Rather, "counsel has a duty to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In considering counsel's decision not to investigate or to limit the scope of their investigation, we assess the reasonableness of counsel's decision in light of all the circumstances, "applying a heavy measure of deference to counsel's judgments." *See id.*

At the motion for new trial hearing, Kines named several witnesses he claims should have been interviewed and presented at trial. We assess whether counsel's decision not to interview and present a particular witness "was reasonable under all the circumstances, giving heavy deference to counsel's judgment." *Alvarado v. State*, No. 04-03-00289-CR, 2006 WL 332536, at *4 (Tex. App.—San Antonio Feb. 15, 2006, pet. ref'd) (mem. op., not designated for publication). We will reverse a conviction only if the consequence of counsel's inaction prevents the accused from advancing his only viable defense, and there is a reasonable probability that, but for counsel's failure to advance the defense, the result of the proceeding would have been different. *Cantu*, 993 S.W.2d at 718. Additionally, "[c]ounsel's failure to call witnesses at the guilt-innocence and punishment stages [of trial] is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).

### a. Trial Evidence

#### 1. Jacobs's, Marroquin's, and Casias's Testimony

In its case-in-chief, the State primarily relied on the testimony of Ronald Jacobs, Alejandro Marroquin, and Emilee Casias. These witnesses each described an alleged assault on an unnamed female that occurred earlier on the night of Edens's murder.

Jacobs testified that, on May 10, 2016, he and Marroquin arrived at the home of Jacobs and Kines and saw a female tied up on the floor of Kines's room. Jacobs observed Kines and Stuart Fraser place the female in a vehicle, and then Marroquin drove the female away from the house.

Marroquin testified that he drove the female to an open area near a school, where he left her bound inside the vehicle. He then walked back to the house.

Casias testified that Kines, Fraser, and Edens had beaten, robbed, and restrained the female with duct tape in Kines's room. Jacobs and Marroquin then arrived, placed the female in her vehicle, and drove her away. When Jacobs and Marroquin arrived back at the residence, they told Kines they "took care of that."

According to all three witnesses, after they returned, Fraser demanded that no one leave the house until the next morning. At that time, Jacobs, Marroquin, Casias, Edens, Fraser, and Kines were present in the house.

Jacobs testified that, at some point during the night of May 10–11, 2016, Edens wanted to leave, but Fraser and Kines refused to let her go. After repeated efforts by Edens to leave the house, Edens became upset and Fraser hit her with the butt of a gun. According to Jacobs, Kines told him to leave the house, and when he returned about twenty minutes later, he observed Edens dead on the floor, covered in a white blanket.

Marroquin similarly testified, adding that Kines had placed duct tape on Edens's mouth and threatened to hit her if she took it off. After she removed the duct tape, Kines and Fraser moved her to the floor and started punching her. When Edens attempted to crawl toward the back door, Fraser stomped on her twice and hit Edens on the head with an aluminum cane, and Kines hit her on the head with a moonshine bottle that looked like a gallon jug. Next, Fraser hit Edens on the head with a table saw. Kines then got on top of Edens and "it looked like [Kines] was trying to smother her." Marroquin believed Edens was dead after Kines got off of her.

Casias offered a similar version of the events, again relaying Edens's attempts to leave and the actions by Kines and Fraser, respectively. Medical expert testimony established that Edens's cause of death was strangulation and head trauma, in concert.

Jacobs, Marroquin, and Casias also testified similarly about events that transpired after the murder. All three testified that Fraser left the house after Edens's murder. According to Jacobs and Marroquin, Kines ordered them to wrap Edens's body in a blanket and a blue tarp and to place the body in the trunk of Edens's vehicle. The three and Kines drove to a pawnshop to pawn a TV and jewelry. The group then drove to a dollar store to buy shovels and then to Calaveras Lake, where they attempted unsuccessfully to bury Edens's body. They ultimately pulled over on the side of a country road in the area of Floresville, Texas, where Kines burned her body. They then drove back to San Antonio where they disposed of the shovels. As the group drove through an alley near the house where Kines and Jacobs lived, Jacobs jumped out of the vehicle. Kines then drove to a convenience store where he bought a can of butane. He then drove into a vacant lot, where the vehicle got stuck on a slab of concrete. Casias testified that, while Marroquin was putting lighter fluid on the vehicle, she took off running towards her aunt's house. Kines walked off towards the direction Casias went, and Marroquin walked back to the house. Jacobs and Marroquin later returned to the vehicle and, as instructed by Kines, Jacobs lit the vehicle on fire.

### 2. Kines's Testimony

Kines was the only defense witness. Kines testified that, on May 10, 2016, Casias and Edens spent the night at his house. Around 2 a.m., Edens visited Priscilla Fonseca's house but returned about 30 minutes later. The following afternoon around 1 p.m., Kines, Casias, Jacobs, and Marroquin drove to Calaveras Lake to fish, and Edens let him use her vehicle. Edens had stayed behind at their residence to do drugs with Jacobs's uncle, Baylum.[1] The group left Calaveras Lake at about 6 p.m., stopped at a convenience store, and then headed back home. When they arrived back at the house, Edens and Baylum were still there. Jacobs and Marroquin

---

[1] The record does not indicate this individual's full name.

discovered drugs were missing from their room and accused Baylum and Edens of stealing it. Baylum blamed Edens, and Jacobs and Marroquin wanted Edens to come up with the money for the stolen drugs. Marroquin, Jacobs, Casias, and Edens then left in Edens's vehicle. Kines stated that was the last time he ever saw Edens. Kines denied any knowledge about the alleged assault on the unnamed female, Edens's murder, the disposal of Edens's body, and the destruction of Edens's vehicle.

### b.    Motion for New Trial Hearing

At the motion for new trial hearing, only Kines and his trial counsel testified. None of the potential witnesses either testified at the motion for new trial hearing or provided a sworn affidavit. Although Kines stated at the motion for new trial hearing that each potential witness was willing to testify for him, the record does not show these witnesses were available to testify on the date of his trial. *See Alvarado*, 2006 WL 332536, at *9 ("The record does not show . . . that [the witnesses] would have been available to testify on the date of trial; therefore, counsel's failure to call [the witnesses] cannot constitute ineffective assistance." (citing *King*, 649 S.W.2d at 44)). We address each of the potential witnesses Kines complains of below.

### 1.    Baylum

Kines contends that his trial counsel should have interviewed and presented Baylum as a corroborating witness to the timeline of events at trial. According to trial counsel, Kines instructed him not to pursue Baylum as a witness and claimed Baylum was not his biological uncle, had abused him as a child, and would not be good for his case because Baylum would be "pro-Ronald [Jacobs]." Kines denied instructing trial counsel not to pursue Baylum as a witness.

The trial court alone determines the credibility of the witnesses and has the discretion to believe or disbelieve all or any part of the witnesses' testimony. *See Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). Here, the trial court could have concluded that trial counsel was

not deficient for failing to investigate and present Baylum as a witness at trial because Kines had instructed him not to do so. *See Ex parte Olvera*, No. 05-11-01349-CR, 2013 WL 4052467, at *6 (Tex. App.—Dallas Aug. 12, 2013, pet. ref'd) (mem. op., not designated for publication). Here, the record reflects Kines himself testified to a timeline of events, and Baylum was not shown to be an available witness. *See Alvarado*, 2006 WL 332536, at *7 (concluding prejudice was not shown by counsel's failure to present a potential alibi witness when the defendant was able to establish his alibi defense through his own testimony); *see also King*, 649 S.W.2d at 44.

### 2. *Priscilla Fonseca*

Similarly, Kines contends Priscilla Fonseca was a possible and willing corroborating witness to the timeline of events he presented in his defense. Trial counsel testified that the value of her testimony regarding the timing of events was outweighed by the potential for harm from testimony that would further implicate Kines. Trial counsel testified that Fonseca may have testified on cross-examination that Kines had gone to Fonseca's house after Edens's murder looking for Casias. The jury could have reasonably questioned Kines's innocence after hearing testimony that, following Edens's murder, Kines went searching for Casias, a purported witness to the very crime for which Kines was being prosecuted.

Based on this record, we conclude that trial counsel's decision not to develop and use Fonseca as a witness did not fall below an objective standard of reasonableness. *See Bone*, 77 S.W.3d at 835.

### 3. *John Waclawczyk and Terence Lamont Mason*

Kines contends that Waclawczyk, while incarcerated, heard Marroquin state Kines was not involved in Edens's murder. Kines contends Terrence Lamont Mason shared a cell with Marroquin and that Mason heard Marroquin admit to lying to police in order to implicate someone else. Trial counsel testified these statements benefited Fraser, not his client. The State's theory

was that Kines and Fraser, in concert, murdered Edens. Thus, the statements would have had little to no benefit for Kines because the jury still could have concluded that he murdered Edens. Kines does not complain of trial counsel's performance during trial, and the record shows that counsel cross-examined Marroquin extensively about the inconsistencies between his statements to police and his trial testimony, as well as between his testimony and that of Jacobs and Casias. Because the record is silent as to trial counsel's reasons for not investigating or presenting an impeachment witness, Kines cannot overcome the strong presumption of reasonable assistance. *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.); *see Bone*, 77 S.W.3d at 836 ("The defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission.").

### 4. *Genevieve Ramos*

Kines contends Genevieve Ramos would have testified that Marroquin told her that the "real killer" was Fraser and that Marroquin intended to provide a written statement clearing Kines's name. The record indicates Ramos appeared by bench warrant and was interviewed by counsel, who ultimately determined Ramos could not benefit Kines. For the same reasons outlined above, we determine counsel's decision did not fall below an objective standard of reasonableness.

### 5. *Jennifer Debner*

According to Kines, Jennifer Debner was Edens's best friend, and would have testified that Casias is a "toxic person," that Debner and her friends had always joked that Casias would end up killing Edens, and that Casias's brother did not believe anything Casias said. Trial counsel testified that, like Fonseca, Debner on cross-examination may have claimed Kines had tried to force his way into Fonseca's house looking for Casias following Edens's death. Additionally, the record shows that trial counsel cross-examined Casias extensively about the inconsistencies in her trial testimony, as well as her admitted drug use and its effect on her apparent lack of recollection as to

certain details of Edens's murder. Under the circumstances, it was reasonable for counsel to determine that the potentially beneficial impeachment testimony that Debner could have provided was outweighed by the risk of eliciting potentially incriminating testimony that could have weakened Kines's innocence defense. *See Bone*, 77 S.W.3d at 835. Moreover, trial counsel's failure to present Debner as a witness did not preclude Kines from advancing his defensive strategy to impeach Casias's credibility. *See Alvarado*, 2006 WL 332536, at *8. We conclude that trial counsel's decision did not fall below an objective standard of reasonableness.

6. *Kines's Mother[2]*

Kines contends that his trial counsel should have interviewed his mother prior to her death. According to Kines, his mother died at some point in 2017. Kines contends his mother would have provided testimony about a post-arrest incident that involved Fraser, whom she believed had broken into her house and threatened her.

Kines's trial counsel recalled his client telling him about the alleged break-in but did not have an opportunity to speak with Kines's mother before her death. His attorney-fee voucher was admitted into evidence. The fee voucher indicates that counsel was appointed in September 2017. The record does not reflect the date Kines's mother died. Additionally, Fraser did not testify at trial, and Kines does not show how his mother's testimony would have benefited his defense or negated the prosecution's theory. *See King*, 649 S.W.2d at 44.

7. *Kines's Neighbors*

Kines contends his neighbors would have served as character witnesses and testified that nothing out of the ordinary occurred on the night of Edens's murder. However, Kines provides no

---

[2] The record does not identify Kines's mother by name.

record as to these purported neighbors to overcome the presumption of reasonable assistance. *See Jaynes*, 216 S.W.3d at 851.

On this record, Kines cannot show that the trial court erred in denying his motion for new trial based on ineffective assistance of counsel.

## B.     FAILURE TO COMMUNICATE

Kines also contends his trial counsel failed to prepare him to rebut the State's evidence at trial by failing to sufficiently communicate with him about anticipated evidence.

"To prevail on a claim of ineffective assistance of counsel for failing to adequately prepare the client to testify, a movant must demonstrate that the alleged error caused the client prejudice; [meaning], that better preparation would have benefitted the client and led to a better result." *Shamim v. State*, 443 S.W.3d 316, 324 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

Here, Kines has failed to show that additional preparation and communication between Kines and his counsel prior to trial would have changed the outcome of the proceeding. According to Kines, lack of communication and preparation had four harmful effects. First, had he been prepared, he would have advised the jury that Edens's death occurred because she allegedly stole drugs from Jacobs and Marroquin. However, Kines testified to this alleged drug theft on direct examination at trial. Similarly, the State introduced both a cap that was found in Edens's vehicle and video from the convenience store of Kines wearing the same cap. According to Kines, had he been prepared, he would have testified that he left the cap in Edens's vehicle after his fishing trip with Casias. However, even without additional preparation, Kines provided the jury with an explanation as to how his cap ended up in Edens's vehicle when he testified that he drove Edens's vehicle to the lake for his fishing trip with Casias. Third, the State introduced a picture that depicted a bottle of bleach in Kines's room. Kines complains that, had he been prepared, he would have testified that he used the bottle of bleach to clean up after his puppies. However, Kines was

given the opportunity to explain the bleach's purpose at trial but did not do so.  When referencing Kines's original statement to police, the State asked Kines on cross-examination, "you told them you were trying to use that bleach to clean, right?"  Kines stated in response, "I don't remember telling them anything like that."  Last, Edens's body was found wrapped in a comforter or bed sheet.  The State introduced a picture of Kines's room, which depicted a bare mattress.  According to Kines, had he been prepared, he would have testified that the comforter or sheet could not have come from his bed because he never had a comforter or sheets on his mattress.  Even assuming that better preparation would have elicited this testimony, Kines has not shown there is a reasonable probability that had the jury heard this bit of testimony, the result of the proceeding would have been any different.  *See Strickland*, 466 U.S. at 694.

We conclude Kines has failed to show that additional preparation and communication between Kines and his counsel prior to trial would have changed the outcome of the proceeding.

## CONCLUSION

Viewing the totality of trial counsel's representation, we conclude Kines has failed to show deficient performance or prejudice, and therefore affirm the trial court's denial of his motion for new trial.

Rebeca C. Martinez, Justice

DO NOT PUBLISH